NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200575-U

NO. 4-20-0575

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 8, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* ADOPTION OF T.B. | ) | Appeal from the |
| | ) | Circuit Court of |
| (Caleb S. and Jasmen S., | ) | Champaign County |
|     Petitioners-Appellees, | ) | No. 19AD10 |
|     v. | ) | |
| Eric B., | ) | Honorable |
|     Respondent-Appellant). | ) | Randall B. Rosenbaum, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1 *Held*: (1) The trial court did not err by not entering a directed verdict in respondent father's favor at the close of petitioners' case.

(2) The trial court's finding respondent father was an unfit parent based on depravity was premature.

(3) The trial court abused its discretion in denying a motion to continue that would have allowed respondent father to review discovery materials based on the erroneous conclusion evidence of rehabilitation was irrelevant to the charge of depravity.

¶ 2 In February 2019, petitioners, Caleb S. and Jasmen S., filed a petition to adopt,

seeking to terminate the parental rights of respondent father, Eric B., as to T.B. (born June 22,

2010). Jasmen is the biological mother of T.B., and she was married to Caleb. Petitioners alleged

Eric was an unfit parent on multiple grounds, including that he was depraved.

¶ 3    After finding Eric depraved and unfit, the trial court, in September 2020, terminated Eric's parental rights as to T.B. Eric appealed, arguing (1) a motion for a directed verdict in Eric's favor at the close of petitioners' case was obligatory and should have been granted, (2) the finding of depravity was against the manifest weight of the evidence, and (3) the trial court abused its discretion by delaying its ruling on Eric's February 24, 2020, motion to continue the adjudicatory hearing and in denying him leave to file a late response to the request to admit facts. Agreeing in part with the third argument, we reverse and remand.

¶ 4                                    I. BACKGROUND

¶ 5    In their petition, Jasmen and Caleb alleged Eric, a prisoner at the Pontiac Correctional Center, was an unfit father on multiple grounds under section 1(D) of the Illinois Adoption Act (750 ILCS 50/1(D) (West 2018)). One of the grounds of unfitness alleged was depravity based on Eric's criminal convictions and failure to conform to society's norms (750 ILCS 50/1(D)(i) (West 2018)). Petitioners alleged termination of Eric's parental rights and the adoption of T.B. were in the best interest of T.B.

¶ 6    On February 24, 2020, the hearing on parental fitness was set. At the start of the hearing, Eric's counsel reported she had spoken to staff of the Department of Corrections (DOC) on Thursday, February 20. She was assured the "writ" had been accepted and "[i]t had been planned for and *** the transportation would be handled appropriately." Counsel reported she received a call at 7:37 a.m. that day and was informed transportation could not occur. It was planned Eric would be in a wheelchair. When they attempted to put Eric in a wheelchair, he represented he was not strong enough to sit in the wheelchair and "was sliding down the wheelchair." An ambulance had not been planned, so one was not available that morning. A

DOC staff member said an ambulance could transport Eric in a bed at another time. Counsel stated, "I do believe that I have to request a continuance" until Thursday to get an ambulance. Counsel reported Eric had a massive stroke after receiving the petition and preparing a response. Eric had moved to multiple facilities seeking medical treatment but was at Dixon Correctional Center at the time of the hearing.

¶ 7 The trial court questioned counsel regarding how much time was needed for a hearing. The court then asked petitioners for their response to Eric's counsel's request for a continuance. Petitioners' counsel began by asking, "as an evidentiary matter, we can admit—and I've got it right here, and I definitely think we need to do this. We can admit his responses to the request to admit. He had counsel. He was represented by counsel and he made these admissions. So I think that's an evidentiary matter we can take care of first."

¶ 8 The trial court agreed first to the issue regarding the requests to admit. The court asked Eric's counsel if there was an objection. Counsel responded: "I do believe, yes, this was agreed upon after my conversation with him. I was just looking through my notes to confirm my recollection." The court ruled it would admit the exhibit. Petitioners stated they would produce no other evidence. Eric's counsel stated she would call Eric to testify and then they would have arguments.

¶ 9 Petitioners objected to the continuance, noting petitioners had been waiting but agreed they could continue the matter until Thursday if the court would proceed immediately to the best-interest hearing. Eric's counsel had no objection. The trial court continued the matter until Thursday.

¶ 10 The adjudicatory hearing on the petition was held on February 27, 2020. Eric was

present in the custody of DOC. He appeared at the hearing on a gurney with his feet and hands restrained. The trial court noted it admitted the request to admit into evidence without objection. The court further noted for the record the answers were deemed admitted, denied, or withdrawn by agreement. Petitioners had no other evidence to admit on the issue of unfitness.

¶ 11 Eric was deemed to have admitted the following offenses: (1) 2003 conviction for felony aggravated battery of a peace officer in Cook County; (2) 2004 convictions of three felony counts of armed robbery in case Nos. 04-CR-1402701, 04-CR-1502801, and 04-CR-1502601; (3) 2005 conviction of felony aggravated battery of a peace officer; (4) 2006 conviction for home invasion causing injury; (5) 2006 conviction for escape with a dangerous weapon; (6) 2006 conviction for residential burglary; (7) 2006 conviction for attempted aggravated arson; (8) 2006 conviction for aggravated battery harm of a peace officer; (9) 2006 conviction for aggravated battery of a government employee; and (10) 2010 conviction for armed robbery with a firearm. Eric was also deemed to have admitted he was serving a 55-year prison sentence with a projected parole date of February 19, 2038.

¶ 12 Eric testified on his own behalf. He was convicted of his last offense in February 2014 and had been imprisoned since that time. In the beginning of 2010, Eric was incarcerated. Eric "used to see [T.B.] on the phone," and Jasmen brought T.B. to see him. Eric testified, "and then a couple of years, you know, due to a court order, me and [Jasmen were] co-defendants on a case. Someone said the conclusion of that case, though, the judge ordered that it be no communication between the both of us, you know, because we [were] co-defendants and they ain't whatever. So—so after like 2016, that's when [Jasmen], you know, got back in tune with me, my son wanted to contact me, and then that's when we started talking, writing each other,

and we was just doing that for years." Eric wrote T.B. letters. Eric testified he tried to educate his son on history, including black history and American history, as well as politics. T.B. wrote letters, too. He sent drawings. The two developed a "real close" relationship.

¶ 13 When asked about employment, Eric testified to the following: "No, but I was receiving—you know, I had income coming in when I was first incarcerated. And during that time, like when my son was first born from like 2010 to 2012[,] I was sending [Jasmen] over like a couple of thousands, like just at a time. Like asked, you requested, or just sending it, just so she could have things for her and my son." With money Jasmen sent him, Eric sent his son "cards and stuff like that" for holidays and his birthdays.

¶ 14 Eric testified after Jasmen met Caleb things changed. Jasmen and Caleb did not provide Eric with T.B.'s address, meaning DOC would not allow him to send anything. Eric stated he hired an attorney to fix the situation but due to Caleb's "insecurities *** that was unable to happen."

¶ 15 Eric further testified about the current status of his most recent criminal case. He testified he was "going through the wrongful[-]conviction thing" as "[t]hey just found out another guy committed the crime." According to Eric, three people were involved: "It was me, the plaintiff, [Jasmen], and my cousin, Michael King. He just got out. He's—he got released last year. He got exonerated."

¶ 16 On cross-examination, defendant testified he did not know whether Jasmen pleaded guilty to an obstruction-of-justice offense involving hiding Eric's name from the police. As to the money he sent to Jasmen for T.B., Eric testified he received that money from his family. When asked what he had done to rehabilitate himself from his twelve felonies, Eric

testified he obtained his paralegal certificate and he taught classes, such as "crafts classes on history, black history." Eric did "a lot of legal stuff" and helped firms. Eric further testified to the following:

"I'm doing—I also got, you know, you know, like mental problems and stuff like that. That kind of—most of my convictions back then that you're referring to as far as aggravated batteries, those is like mental-related, it wasn't no gang-related stuff. It was just, not off of my medication and stuff like that, getting the proper treatment that I was supposed to get, and it resulted to me flipping out and freaking out. So they just learned recently that I had these problems since I've been incarcerated this time, and I've been in the—what's called a residential treatment unit. And I learned like coping skills and stuff like that, how to better cope with my anger, and you know, grief, and loss, and stuff like that. I got these certificates, so I'm actually still in the program. It'll take a few years, but I'm doing pretty good, though. That's what I've been doing over the years, basically trying to get in tune with myself, to make myself a better person, a better man, too, so I can live. I don't want to get out of prison doing the same things that I was doing before."

¶ 17      After counsel asked if he provided copies of the certificates to paralegal school or other documentation to his attorney, Eric testified his attorney did not ask for those documents.

- 6 -

When asked about his 2003 offense, Eric testified he was off his medication and he did not remember the details. When asked about the 2004 armed-battery convictions, Eric denied guns were used. He explained he was in prison and it was just regular batteries: "no, it's just a regular battery. It's just—I can, like if I freak out and they trying to restrain me, and like, you know, I'm, get off me, get off me. And I'm like, you know, I'm off my medicine." Eric disagreed his 2005 felony aggravated-battery-of-a-peace-officer-with-a-firearm offense meant he had a gun. Eric explained it was the same situation where the officer was attempting to restrain him and Eric was not on his medication.

¶ 18        Eric denied committing the 2006 home invasion offense and residential burglary, stating he was incarcerated from 2004 to 2009. Eric maintained the information regarding his convictions was inaccurate. In 2006, Eric was convicted of attempted aggravated arson in Cook County. Eric explained he, at the time, was off his medication and "they didn't know that I was supposed to be in the certain ward that I was in, and I had just lit—lit my cell on fire, inside my cell. Voices was telling me to do it." When asked about the nature of the aggravated batteries in 2006, Eric testified "[b]eing in restraints." In 2010, he had a felony armed robbery with a firearm in De Kalb County. Eric stated, "That's the one that I'm on the wrongful conviction exoneration out."

¶ 19        Eric testified his mental problems were recently diagnosed and he had just begun getting treated for those issues. Eric stated he had been getting better and "just working towards my freedom." Eric said he was "going to get exonerated *** like [his] co-defendants just did."

¶ 20        Petitioners then tendered copies of their interrogatories, to which Eric's counsel did not object. After the trial court stated, "They will be admitted," Eric stated: "Hey, your

Honor, I would like to object. If she ain't finna—I'll—I'll just dismiss her—." Eric stated he wanted to proceed *pro se*. Eric told the court he could not tolerate his attorney's lack of effort in helping him, stating the following in part:

> "I don't even know this lady. She don't know me. She don't care about my son, obviously, because she didn't even ask me anything about these questions. I got letters. I got stuff. I even—even if the plaintiffs—the plaintiff brought Ms. Cunningham to see me in prison. They know I'm not a bad person or anything like that. Whatever this tricked off with this is for personal reasons. And we talked about this, and she said different things to me that's happening today. So I will do my own defense, and do whatever I got to do."

¶ 21 Eric further explained to the trial court appropriate accommodations had not been made for his medical care needs. Eric explained he had been sitting in a soiled diaper for hours. Eric reported he used the bathroom at 6:30 a.m. and had been forced to sit in feces with open sores. No one was available to clean him. He reported he needed help.

¶ 22 The trial court stated it understood Eric's argument and it would take up Eric's request in "a minute." The court observed Eric was in the middle of his testimony and defense counsel and the guardian *ad litem* (GAL) might clear up some of the questions. The court stated it would consider Eric's request to represent himself after his testimony.

¶ 23 On redirect examination, Eric testified he had suffered multiple strokes. He believed he had suffered more than 10. They began after he was served with the petition to

adopt. The "husband" did not want Eric to send gifts or letters. Eric's whole focus was on his son. Eric testified his diagnosis was "something like cerebral or something" and it was "like a gene" and a "rare brain disease." The disease attacked his cells, which narrowed the vessels and led to the strokes. Eric was sick and unable to speak for quite some time. Eric was taking Seroquel after he was incarcerated the first time. He could no longer take that medication due to his strokes. Eric's treatment was "more like daily one-on-one individual treatment to help [him] cope ***." Eric's health continued to be an issue. He used to be handfed. He had to wear diapers.

¶ 24 Eric testified he had communicated a couple of times with his counsel by phone. The two talked and Eric reported he answered every question he was asked. He did not remember the questions petitioners' counsel was asking. Eric stated his counsel did not ask those questions. Eric's counsel asked, "we did not go over the request to produce; is that correct?" Eric responded, "I don't know those titles like what you saying[;] I just remember the question." Eric's counsel asked, "So we did the questions that—the questions that you did not recognize, we did not go over?" Eric responded as follows:

> "Because I got letters. I got letters from my son. I got letters from Jasmen. I purely love, it's no problems or complications recently, up until you know, the boyfriend, husband, or boo boo, whatever you want. But the thing is, what I'm trying to say is like I—you didn't ask me about none of those things. And if you were to ask me, I would have told you I got them in my possession, as far as like, like the records of the—you know what I'm saying? The, the trust fund and then all that, and my attorney.

My attorney tried to send [T.B.] clothes and all type[s] of stuff for Christmas, that before prior to the stroke. And you didn't ask me about none of that stuff. So, that's why I'm just asking the judge to proceed *pro se*."

¶ 25       Eric stated counsel was not doing anything to show he was involved in his son's life. Eric further asked for more time to go over discovery. Petitioners' counsel objected, stating there was no reason to continue the case as respondent had been represented by counsel.

¶ 26       The trial court asked what evidence Eric would produce on the issue of fitness. Eric responded as follows: "I got documentations from doctors, psychiatrists. I got certificates, I got all type of stuff that I could present to the court and show that I'm fit to, you know, remain within my parental rights."

¶ 27       The trial court asked petitioners' counsel the following: "Are you arguing, based on the testimony here today, that you are going forward on all—all of those, or just certain ones? Because it may affect the need for other evidence."

¶ 28       Petitioners' counsel responded: "I would be willing to proceed on depravity alone. And I—if I—I don't know the exact time frame, but I would like to say, and I need to say this very clearly to [Eric] and everybody else in the courtroom, that there are other parties with rights here, too, and my clients have proceeded through the unfitness proceeding, and any delay at this time is unnecessary and certainly harms their position in wanting to form a family for the child, and their right to proceed ***."

¶ 29       The trial court determined any evidence Eric was hoping to produce would go to issues related to T.B.'s best interest and thus the court would not rule on Eric's request to

terminate counsel until after ruling on the matter of his parental fitness:

> "He believes that he may be exonerated of the most recent one for which he's in custody. He is asking to represent himself, which I'm going to deal with in a moment.
>
> He is asking for more time to go through information, and perhaps produce additional testimony and evidence. It appears, however, that [petitioners] at this point is only going on the depravity count, and the types of evidence that [Eric] seeks to introduce appear to be more best[-]interests issues. I love my son. I want to have contact with my son. I have people who can say that. There's been communication with my son[;] *I have rehabilitated myself by going through classes. But they really don't bear on the issue of fitness.*
>
> THE RESPONDENT: Yes, they do.
>
> THE COURT: And therefore what I'm going to do at this point is go forward on the issue only of fitness right now ***."
>
> (Emphasis added).

¶ 30 The trial court heard argument. Eric's counsel argued the following in its entirety, answering one question by the trial court:

> "[ERIC'S COUNSEL]: Yes, your Honor. My client does not—I understand the cases that he's been charged with. My client does not believe that he technically is defined as depravity [*sic*].

- 11 -

He believes that under the statute, which I have reviewed, it deems the last conviction needs to be within five years of the filing of the petition. He would like to point out that the petition is not within five years of his last conviction.

THE COURT: But—but doesn't that just bring in the presumption? It's not that he couldn't have a lot of other convictions. The presumption [does not] kick in unless it's within the last five years?

[ERIC'S COUNSEL]: Correct.

THE COURT: Okay, go ahead.

[ERIC'S COUNSEL]: But he believes that you should consider that and consider that the last conviction that he's had has been beyond the five-year limit. Thank you, your Honor."

¶ 31 The court asked Eric if he had a response. Eric said he had been struggling his entire life. When he was eight years old, he saw his father shoot and kill his mother. He had been working with PTSD and had been incarcerated his entire life. Eric reported he was dealing with the issues:

"And that's where the certificates come, and my psychiatrists and all that. They'll be able to tell you more, like how traumatized I was, and how the treatment that I wasn't—that I needed but wasn't getting at those times when I was, you know, catching all those cases and stuff like that. They didn't even know

- 12 -

that, you know, I needed help at that time, because they never evaluated me. *** And now they all getting resolved. I haven't been getting in any trouble. You know, I know how to control myself, and you know, manage, you know, my anger, and you know what I'm saying, impulse and all other type of *** regulations ***."

¶ 32　The trial court observed, given the time that passed, there was no presumption of depravity but found Eric unfit based on depravity:

"He has indicated by his own statement that many of these prior convictions were because of mental[-]health concerns, which very well may be true. I'm not saying that they're not, and I can take him for his word that they were. But the statute doesn't talk about the basis of the convictions. It doesn't talk about what the sentence should be, whether it's prison or probation with mental health. It is the conviction itself ***.

* * *

The court finds that based on all of the testimony, the admissions and everything else, much of the argument by [Eric] really goes more towards best interests rather than fitness. The court does find by clear and convincing evidence, and even if the standard were beyond a reasonable doubt, the court would find beyond a reasonable doubt that based on his ongoing lifestyle of

- 13 -

committing offenses in a variety of different contexts, different

offenses over the course of time, and they are all very serious; even

if I exclude the last one, shows that he clearly is at the point where

he has a deficiency in the moral sense shown by the inability or

unwillingness to conform to accepted morality."

¶ 33 After finding Eric unfit, the trial court questioned Eric regarding his decision to proceed *pro se*. The court noted it did not believe any alleged deficiencies by Eric's counsel affected the fitness issue. The court observed "if anything, it bears on the best interests, because on the best interests it's not just do you have prior convictions, it's, you know, do you have contact? Should you continue to have contact? Are you rehabilitating yourself?" The court granted Eric's request to terminate his counsel and represent himself.

¶ 34 On March 11, 2020, Eric filed a *pro se* motion to vacate the order of unfitness. Eric argued the trial court denied him the opportunity to present evidence to challenge the depravity claim. Eric further maintained the trial court "relied on unsupported and false evidence." We note this motion was not ruled upon until December 2020, months after the order terminating parental rights was entered. An email from the court clerk to Eric's appellate counsel indicates Eric's *pro se* motion, which did not indicate whether the motions were sent to opposing counsel or the GAL, was not docketed and the trial court was therefore unaware the motion existed. The email further states the court found the motion untimely and meritless and denied it.

¶ 35 The best-interest hearing was held in September 2020. Eric did not appear. The trial court called one witness, Latonya Stovall, a court clerk. According to Stovall, she spoke with DOC that day and the day before regarding Eric. DOC asked if the matter could be

addressed over Zoom. The trial court denied DOC's request. At 8 a.m., Stovall received another call from DOC. Eric refused to attend court. It was reported Eric "said that if he was to come, he would throw feces, he would poop on [himself], throw feces[;] he would fight staff, he would fight corrections, and do whatever he could do to disrupt the proceedings." The warden decided not to transport Eric to the hearing.

¶ 36        Caleb testified he and Jasmen were married in 2018. T.B. was the oldest of four children in the family. T.B. was 10, and T.B.'s sisters were 4, 2, and 1. Caleb's and T.B.'s relationship was "great." They played sports and video games. They spent one-on-one time together, going each Saturday for haircuts. They loved each other. Caleb was employed full-time and had no criminal record. Caleb provided for T.B. just as he did for his other children. T.B. regularly met with Caleb's extended family, attending "fish Friday" every week. Caleb's mother watched T.B. while he was participating in virtual learning.

¶ 37        Jasmen testified she worked at Brookdale Senior Living. She and Caleb supported the children. She wanted Caleb to be T.B.'s father.

¶ 38        The trial court found it clearly in the best interest of T.B. that Eric's parental rights be terminated. The court made a finding of no just reason to delay enforcement or appeal.

¶ 39        On October 5, 2020, Eric filed a motion for a new trial or for reconsideration of the order terminating his parental rights. In his motion, Eric asserted he did not refuse to be present nor did he refuse to go to court. Eric stated DOC failed to make accommodations for medical aides to be present during court. Eric stated he needed a high level of care and no care would have been provided to him. Eric also asserted the trial court failed to issue subpoenas for witnesses to testify on his behalf. Eric asked Judge Rosenbaum be removed and requested a new

trial judge.

¶ 40        A hearing was held on Eric's motion on October 16, 2020, before Judge Anna M. Benjamin. Eric appeared *pro se*. At the hearing, Eric was asked for argument on his motion to substitute Judge Rosenbaum. In responding, Eric discussed his absence from the best-interest hearing: "I wasn't even there present to hear what was heard, present evidence on my behalf to squash the second phase of the termination of the parental rights and stuff like that. I had evidence, you know, witnesses that I had to present and be asked, you know, why my rights shouldn't be terminated. And I was denied that. I don't know what happened as far as me not appearing, but he made that ruling, so that's why I had included that in there."

¶ 41        Eric further explained there was no evidence presented showing he waived his right to attend the hearing. Eric emphasized no one from DOC appeared and testified he "refused to come to court or anything like that." Eric further stated the following:

> "I would have been able to express those things to him. I would—the judge still—Judge [Rosenbaum] still executed exactly what—it was planned out, like, in my—in my opinion. All of this whole thing was planned out, like, I don't know why I didn't come to court. You can't refuse court in [DOC]. They are—force you whether you—if you don't want to come willingly, they will force you to come.
>
> So, it's a thing with me. I got medication conditions as far as, life, self-care and stuff like that, and Judge [Rosenbaum] know[s] this. So, a—a situation happened the last time we showed

- 16 -

back on February 27, and it was an investigation at [DOC] concerning, like, staff, like, inappropriately touching me and stuff like that, you know, some EMTs. And the EMTs alleged that the judge ordered—Judge [Rosenbaum]—ordered them to, you know, clean me or whatever like that and stuff like that. So, the investigators had to come out and talk to Judge [Rosenbaum] and stuff like that."

¶ 42    Judge Benjamin ruled against Eric on his request to substitute Judge Rosenbaum, finding Eric had not provided any cause or specific bias to warrant his removal. The court ruled the issue of whether it was appropriate to proceed in his absence was a separate and distinct issue.

¶ 43    The remaining issues in Eric's motion were considered by Judge Rosenbaum. The trial court addressed the main error asserted in Eric's motion for a new trial: the best-interest hearing should not have been held in his absence. Eric was placed under oath.

¶ 44    The trial court observed it had received incident reports from September 24, 2020, from DOC. The court read the report:

"On September 24th at 4:25 a.m., this employee, Justin Wilkes (phonetic), received a call from the shift supervisor in reference to Eric Bernard. Major Masters (phonetic) reported that Bernard was refusing to go to court, stating that the ambulance was on grounds and prepared to transport Bernard to Champaign County, but Bernard was refusing to go. Bernard was telling staff

that he was just going to, quote, bug up, and assault staff if we made him go. Bernard was scheduled to be in court at 9 a.m. and due to the time of the incident, the length of time it takes to drive to Champaign, and the offender's prior staff assaults, this employee gave direction not to force Bernard into restraints and into the ambulance."

¶ 45 The next report was dated September 24, 2020, with a time of 4:10 a.m. According to that report: "[Eric] told his sergeant, that's Sergeant Harris (phonetic), that he was refusing to go on his writ because he stated, quote, there is nobody going to take care of me medically and I will just have to bug up."

¶ 46 The trial court asked Eric the reason he could not attend court that day. Eric responded as follows:

"They didn't allow me to come to court. That information you just read[;] none of that happened. I was told earlier that I was gonna go to court, but due to the incident that happened the last time we was at court, when I was left in feces and urine for hours and there weren't nobody to change me. And the EMTs that changed me wasn't certified to do it, so a—a big old investigation came behind that, and you were aware of that because they talked to you, contacted you. But as a result of that, they was trying to figure out how they was gonna send me to court and assure that my medical needs was being met."

- 18 -

¶ 47    The trial court observed the best-interest hearing was originally scheduled for March 12. Due to the coronavirus pandemic, the hearing was ultimately moved to September 24, 2020. The trial court sent Eric a letter in June informing him of the September 24, 2020, hearing date. The court noted at no time did the court receive correspondence from Eric indicating concerns or issues with DOC and its ability to provide medical services to Eric while in court. The court found the letters received from DOC consistent with the testimony of his clerk on September 24 regarding reasons Eric was not going to court. The court found the incident reports credible and no good cause for a new hearing.

¶ 48    This appeal followed.

¶ 49                    II. ANALYSIS

¶ 50        A. Ineffective Assistance for Failure to Seek a Directed Verdict

¶ 51    Eric first argues he was denied the effective assistance of counsel when his counsel at the hearing on parental fitness failed to move for a directed verdict at the close of the petitioners' case. Eric contends the petitioners elected to proceed only on the claim of depravity but the evidence presented was insufficient to establish he was unfit based on depravity. Eric concludes, had counsel moved for a directed verdict, it was incumbent upon the trial court to grant it.

¶ 52    Claims for ineffective assistance of counsel require proof of two factors: (1) counsel's representation fell below an objective standard of reasonableness and (2) but for that error, a reasonable probability exists the outcome of the proceeding would have been different. See *People v. Peeples*, 205 Ill. 2d 480, 512-13, 793 N.E.2d 641, 661-62 (2002). To succeed on this claim, Eric would have to show a reasonable probability the outcome of the

- 19 -

proceeding would have been different had a motion for a directed verdict been made. Directed verdicts shall be "entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Jablonski v. Ford Motor Co.*, 2011 IL 110096, ¶ 88, 955 N.E.2d 1138 (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967)).

¶ 53        Under the Adoption Act, a parent will be found unfit if the petitioner proves by clear and convincing evidence (*In re C.W.*, 199 Ill. 2d 198, 217, 766 N.E.2d 1105, 1117 (2002)) that a parent is depraved (750 ILCS 50/1(D)(i) (West 2018)). A parent is depraved if he or she possesses an inherent deficiency of moral sense and rectitude (*In re J.B.*, 298 Ill. App. 3d 250, 254, 698 N.E.2d 550, 552 (1998)) or demonstrates an unwillingness to conform to acceptable morality (*In re A.M.*, 358 Ill. App. 3d 247, 256, 831 N.E.2d 648, 656 (2005) (McDade, J., concurring)). We will not overturn a determination on parental fitness unless that determination is against the manifest weight of the evidence, meaning "the correctness of the opposite conclusion is clearly evident from a review of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 960, 835 N.E.2d 908, 913 (2005).

¶ 54        Eric contends his convictions alone were insufficient to prove he possesses an inherent deficiency of moral sense and rectitude (*In re J.B.*, 298 Ill. App. 3d at 254). Eric relies on our analysis in *In re S.H.*, 284 Ill. App. 3d 392, 398-99, 672 N.E.2d 403, 407 (1996), as showing "the commission of most felonies, even very serious ones, will not, without more, support a finding of unfitness based on depravity[.]" Eric contends his felonies, committed between 2003 and 2010, were committed before T.B.'s birth at a time when Eric was between

the ages of 21 and 28 and suffering from mental health problems but he was "fit" and it was "not possible to be clearly and convincingly persuaded that, because of those convictions" he was a depraved person.

¶ 55 *S.H.* does not support Eric's claim his *12* felony convictions are not alone sufficient to prove clearly and convincingly he is depraved. In *S.H.*, the court held in most cases "a *single* criminal conviction, without more, will not support a finding of unfitness based on depravity." (Emphasis added.) *S.H.*, 284 Ill. App. 3d at 399. Here, there are 12 felony convictions, not just 1.

¶ 56 Tellingly, the names of the felonies of which Eric was convicted reveal more than he was simply convicted of 12 felonies. The felonies are violent. They involved injuries and weapons. They involved offenses against individuals in authority. The convictions for the felonies spanned a seven-year period, extending into Eric's late twenties. Given these facts, Eric cannot prove a reasonable probability a directed verdict would have been entered.

¶ 57 We further note Eric's reliance on the trial court's finding he was "fit" as showing he had been rehabilitated is misplaced. That finding by the court regarded Eric's argument "he was mentally unstable." The court did not find Eric "fit" to parent but "fit" to testify and participate in the hearings.

¶ 58 B. Sufficiency of the Evidence

¶ 59 Eric next argues the finding he was a depraved person is against the manifest weight of the evidence. Eric points to evidence he presented during his testimony, such as his efforts to maintain contact with T.B. after Caleb limited those efforts, his efforts to be exonerated from his most recent conviction, his obtaining a paralegal certificate, the errors in his conviction

record, and the improvement in his mental health, as showing he was rehabilitated. Eric contends, given this evidence, the trial court erred by determining he was depraved based solely on the convictions.

¶ 60        The mere fact a parent has a felony conviction, even multiple felony convictions, is not sufficient alone to establish depravity. *In re Sanders*, 77 Ill. App. 3d 78, 82, 395 N.E.2d 1228, 1231 (1979). A person's criminal record is one factor to be considered. *Id.* The character and credibility of the parent, when considering a finding of depravity, must be closely scrutinized by the court. *Id.* Some allowance must be given for an individual to be rehabilitated. *Id.* Evidence of rehabilitation is relevant to the question of whether a parent is unfit due to depravity. See generally *In re T.T.*, 322 Ill. App. 3d 462, 466, 749 N.E.2d 1043, 1046 (2001) (holding the statutory presumption of depravity may be rebutted with evidence of rehabilitation). Evidence showing the circumstances of the offenses did not result from depravity is also relevant. *Id.* This court will not disturb a finding of parental unfitness unless the finding is against the manifest weight of the evidence, meaning "the correctness of the opposite conclusion is clearly evident from a review of the evidence." *In re T.A.*, 359 Ill. App. 3d at 960.

¶ 61        The opposite conclusion, Eric is not depraved, is not clearly evident from our review of the evidence presented. As we found above, the evidence was sufficient to withstand a directed verdict on the issue of depravity. In addition to those facts, the trial court observed Eric's credibility and demeanor before ruling on the issue of fitness. While Eric presented some evidence as to rehabilitation, such as testimony regarding his obtaining a paralegal certificate, teaching classes, and obtaining mental health treatment, and some evidence showing the commission of the offenses were due to mental illness and not due to the absence of moral

rectitude, the evidence was not strong. The only evidence on these issues was Eric's vague testimony. No details were provided regarding dates or times. No documentary evidence, such as certificates or mental health records, were submitted.

¶ 62 The trial court's finding is not against the manifest weight of the evidence based on the evidence presented. However, the finding was premature.

¶ 63 C. Eric's Motion to Continue

¶ 64 Eric next argues the trial court erred by delaying its ruling on the February 24, 2020, motion to continue and denying him leave to file a late response to the request to admit facts. Eric emphasizes he had not seen the request to admit or any other discovery documents and it was unjust to not allow him time to file a late response to the request given his health and the failure of his attorney to provide the request to admit facts to him.

¶ 65 In response, petitioners refer to Eric's claim as a "preposterous request for an extension of time to undo proper admissions against him." Petitioners emphasize Eric was represented by counsel and the admissions were properly deemed admitted as Illinois Supreme Court Rule 216 (eff. July 1, 2014) allows. Petitioners further argue the request for an extension of time as to a late response to the requests to admit was forfeited as it was not raised during his unfitness proceeding.

¶ 66 Motions to continue may be granted in the discretion of the trial court and on just terms, on "good cause shown." 735 ILCS 5/2-1007 (West 2018). The decision whether to grant or deny a continuance rests in the trial court's sound discretion. *Somers v. Quinn*, 373 Ill. App. 3d 87, 96, 867 N.E.2d 539, 548 (2007). We will not reverse a decision on a motion to continue unless the decision is an abuse of discretion (*In re Marriage of LaRocque*, 2018 IL App (2d)

- 23 -

160973, ¶ 94, 107 N.E.3d 349), which is found when the "ruling is arbitrary, fanciful, or unreasonable, or when its ruling rests on an error of law" (*McClure v. Haisha*, 2016 IL App (2d) 150291, ¶ 20, 51 N.E.3d 831).

¶ 67        We begin with petitioners' contention the issue is forfeited because Eric failed to raise his argument in the trial court. We find that contention unconvincing. The record reveals Eric made multiple attempts to challenge the admissions or to request the opportunity to review discovery documents that were to be provided to him. After asking the trial court to terminate his counsel, Eric plainly asked for time to review discovery. Although he did not mention the requests to admit facts in his request to review discovery, requests to admit are discovery methods. See Ill. S. Ct. R. 201(a) (eff. May 29, 2014). As to the requests to admit, Eric challenged the authenticity of some of the admitted facts while also asserting his counsel failed to go over discovery matters with him. In addition, Eric, by a written *pro se* motion, raised the issue again less than two weeks after the finding of unfitness. In requesting a new fitness hearing, Eric challenged use of the evidence against him on the matter of depravity. The only evidence entered in petitioners' case arose from the deemed admission of the request to admit.

¶ 68        Turning to Eric's argument, on February 24, 2020, Eric's counsel moved to continue the fitness hearing. We note while petitioners state the delay was due to Eric's "not feeling well," the record shows, without contradictory evidence or argument, the delay was due to DOC's inability to transport Eric who had suffered multiple strokes, his representation he could not support himself in the wheelchair DOC provided, and the need for transportation by an ambulance while on a gurney. No evidence shows otherwise.

¶ 69        It is not the first motion to continue that seems to be the issue, but the deemed

- 24 -

admission of the requests to admit made at a time when Eric was not present and was, therefore, unable to contradict or affirm his counsel's statements. At first glance, this issue seems simple enough as Eric's counsel was present. The record reveals serious questions regarding Eric's representation. At the February 24, 2020, hearing, Eric's counsel "believed" Eric agreed to the admissions: "I do believe, yes, this was agreed upon after my conversation with him. I was just looking through my notes to confirm my recollection." Not only did Eric's counsel show a lack of recall and confidence as to the requests to admit, but also counsel did not dispute Eric's contentions she did not go over discovery with him, provide discovery requests to him, or request supporting evidence, like certificates or medical records, from him. Counsel did ask questions indicating she may have asked questions regarding the admitted facts, but Eric's answers at the hearing to those questions were not clear and he disputed part of the facts admitted. The record is clear, however, that Eric's counsel, in questioning Eric, admitted she did not go over multiple discovery requests, such as a request to produce and interrogatories, when she asked him, "we did not go over the request to produce; is that correct?" and "the questions that you did not recognize, we did not go over?"

¶ 70    The trial court's discussions with Eric and with petitioners' counsel demonstrate the court believed counsel had not discussed discovery matters with Eric or collected documentary evidence regarding petitioner's claims. After hearing Eric's contentions, the court stated additional evidence might be necessary, asking petitioners' counsel the following: "Are you arguing, based on the testimony here today, that you are going forward on all—all of those, or just certain ones? Because it may affect the need for other evidence." Further supporting the conclusion the court questioned the efficacy of counsel's representation, the court ultimately

gave Eric time to gather evidence, postponing the best-interest hearing scheduled to be held the same day as the fitness hearing.

¶ 71    Unfortunately, the "requests to admit" and whether Eric's counsel went over those requests were not matters directly addressed or clearly resolved by the trial court. However, after seeking to terminate his counsel but before the motion was granted, Eric asked the court for time to go over discovery. The trial court denied the request upon finding the evidence Eric would seek and present would not be relevant to the fitness hearing: "He is asking for more time to go through information, and perhaps produce additional testimony and evidence. *** But they really don't bear on the issue of fitness." This is where the trial court erred.

¶ 72    As we observed above, a parent may be found unfit if it is proved by clear and convincing evidence that parent is depraved, possessing an inherent deficiency of moral sense and rectitude (*In re J.B.*, 298 Ill. App. 3d at 254), or demonstrating unwillingness to conform to acceptable morality (*In re A.M.*, 358 Ill. App. 3d at 256 (McDade, J., concurring)). The inquiry does not stop, however, with the petitioners' evidence of depravity: "While a criminal record reveals a rejection of societal mores in the past, it is not conclusive. There must be some allowance for an individual to become rehabilitated ***." *Sanders*, 77 Ill. App. 3d at 82. While the trial court properly concluded the evidence Eric would present would go to matters such as supporting an argument he had been rehabilitated, the court prevented Eric from presenting that evidence, thereby denying him the right to defend himself against petitioners' depravity allegations.

¶ 73    Once it became apparent to the trial court Eric's counsel had not worked with Eric to prepare a defense by developing arguments or complying with discovery requests, confidence

in the admission of the requests to admit should have wavered, and the court should have granted

Eric's motion to continue to go over all discovery. The court did not do so, however, based on an

improper conclusion regarding the relevancy or materiality of the evidence Eric sought. The

denial of the motion to continue the fitness hearing, based on an erroneous application of the law,

was an abuse of discretion. *McClure*, 2016 IL App (2d) 150291, ¶ 20 (stating an abuse of

discretion will be found when the ruling "rests on an error of law").

¶ 74        While we are mindful, as petitioners emphasize, the statutory guidelines to the

Illinois Adoption Act provide the "best interests" of T.B. to be of paramount consideration in the

interpretation of the Act (750 ILCS 50/20a (West 2018)), the law plainly requires at the stage of

parental fitness, the parent's right to maintaining the parent-child relationship is the primary

focus. See *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004). "Parents have a

liberty interest in bearing and raising their children." *In re Adoption of C.D.*, 313 Ill. App. 3d

301, 314, 729 N.E.2d 553, 563 (2000). Because of the liberty interest involved, "certain

due[-]process safeguards have been granted to parents in actions to terminate their parental

rights." *In re D.R.*, 307 Ill. App. 3d 478, 482, 718 N.E.2d 664, 667 (1999). Those safeguards

include the right to be heard, present evidence, examine pertinent court files and records, and be

represented by counsel. 705 ILCS 405/1-5(1) (West 2018).

¶ 75        In this case, the trial court tried to ensure Eric was provided all process due him,

allowing him ample time to make the arguments on his behalf, addressing his claims, and

providing additional time and discovery for the best-interest hearing. Despite these efforts, an

error of law was made. This was not an error made by the trial court alone. Eric's counsel failed

Eric, petitioners, and T.B. by not informing the court of the law on depravity or disputing the

court's conclusion rehabilitation evidence was not relevant to the fitness determination. Because proceedings under the Act are not intended to be adversarial (*id.*), petitioners' counsel and the GAL bear fault as well. We note only Eric asserted the court was incorrect in its assertion the evidence of his rehabilitation was not relevant to fitness.

¶ 76    The fact this prolongs the process of finding T.B. and petitioners the stability they seek is not lost on this court. However, the termination of the fundamental right of a parent to a relationship with his child cannot be done in a manner that ultimately denies any parent the ability to prepare a defense. Of note, in addition to the above, Eric's counsel made no effort in closing argument to show Eric was rehabilitated by pointing to his testimony showing he taught classes, obtained a paralegal certificate, or by showing the convictions were due to mental illness and not depravity. Counsel simply reported Eric wanted the court to know the presumption of depravity did not apply. It appears Eric's counsel, the GAL, petitioner's counsel, and the court all acted as if the determination of parental unfitness was a foregone conclusion.

¶ 77    We are chagrined by the situation Eric found himself in during the fitness hearing and potentially during the best-interest hearing. The record establishes Eric was forced to sit in his own feces and suffer injury while doing so. No person should have to endure this indignity, particularly while attempting to protect his or her rights in a court of law. Eric had to continue doing so even after informing the court of his situation. It also appears there is some question as to whether this situation, which appears on record, had some effect on Eric's failure to attend the best-interest hearing. Given the record plainly establishes DOC's February 24, 2020, last-minute need to postpone that hearing due to its failure to anticipate Eric would need a gurney and an ambulance to attend court, there is evidence DOC is not appropriately anticipating Eric's needs.

- 28 -

On remand, it is our hope the trial court, DOC, Eric, and the attorneys will work to ensure Eric's physical and basic needs will be met and the next hearings will be held as scheduled.

¶ 78    Eric should be afforded the opportunity to rebut the weight of his convictions in several ways. First, someone must ascertain the accuracy of the number of convictions. Second, Eric deserves the assistance of counsel who will advocate for him. Third, the answers to the requests to admit deserve thorough discussion between counsel and Eric. We understand the delay will be a hardship for the petitioners. We also recognize Eric has significant obstacles to overcome. At the same time, he deserves a day in court to present evidence.

¶ 79                    III. CONCLUSION

¶ 80    We reverse the trial court's judgment and remand for further proceedings.

¶ 81    Reversed and remanded.